```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
 4                    Plaintiff,            1:21-cr-00034-CRC-1
                                            Thursday, August 11, 2022
 5      vs.                                 2:04 p.m.

 6      THOMAS ROBERTSON,

 7                    Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10               TRANSCRIPT OF SENTENCING HEARING
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:

13

14      For the United States:      ELIZABETH ANN ALOI, ESQ.
                                     RISA BERKOWER, ESQ.
15                                   U.S. ATTORNEY'S OFFICE FOR D.C.
                                     555 4th Street, NW
16                                   Washington, DC 20003
                                     (202) 252-7212
17                                   elizabeth.aloi@usdoj.gov

18      For the Defendant:          MARK M. ROLLINS, ESQ.
                                     ROLLINS & CHAN
19                                   419 Seventh Street, NW
                                     Suite 405
20                                   Washington, DC 20004
                                     (202) 455-5610
21                                   mark@rollinsandchan.com

22      Court Reporter:             Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
23                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
24                                   Washington, DC  20001
                                     (202) 354-3187
25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3     record for Criminal Case 21-34, Defendant 1, in United
 4     States of America vs. Thomas Robertson.
 5              Counsel, approach the lectern and identify
 6     yourselves for the record starting with the government.
 7              MS. ALOI:  Good afternoon, Your Honor; Liz Aloi
 8     for the United States, and with me at counsel table is
 9     Assistant US Attorney Risa Berkower and FBI Special Agents
10     Kathryn Camiliere and Christen Holcombe.
11              THE COURT:  Okay.  Good afternoon, ladies.
12              MR. ROLLINS:  Good afternoon, Your Honor; Mark
13     Rollins on behalf of Thomas Robertson.
14              THE COURT:  Okay.  Good afternoon, Mr. Rollins.
15              Mr. Robertson.
16              Are we ready to proceed?
17              Okay.  The Court has read the presentencing
18     investigation report -- and I should note that Ms. Baker
19     from probation is here with us -- both the government and
20     the defense memoranda in aid of sentencing and both sets of
21     supporting exhibits, including letters from the defendant
22     and from a number of his former colleagues and family
23     members and friends, including letters from his wife, from
24     his daughter, and from his daughter's father.
25              Any other written materials for the Court's
```

```
 1    review?  I know I received a PowerPoint from the government
 2    earlier today, which I assume you will go through later.
 3            Any guests you'd like to introduce or acknowledge,
 4    Mr. Rollins, and will anyone be addressing the Court?
 5            MR. ROLLINS:  No, just myself.
 6            THE COURT:  Okay.  Starting with the presentence
 7    investigation report, are there any objections to just the
 8    factual findings?  Setting the guidelines calculations to
 9    the side, any objections that were not noted or otherwise
10    resolved?
11            And I'll tell you what, we're going to spend a lot
12    of back-and-forth, I suspect, on the calculations; so why
13    don't you just address the Court from counsel table with the
14    microphone, and then, when we address the sentencing
15    factors, you can come up to the podium.
16            MS. ALOI:  The government has no additional
17    objections not previously identified.
18            THE COURT:  Mr. Rollins?
19            MR. ROLLINS:  And defense has no additional
20    objections other than what we've put -- what we objected to.
21            THE COURT:  Mr. Robertson, have you reviewed the
22    presentence investigation report with Mr. Rollins?
23            THE DEFENDANT:  Yes, sir, I have.
24            THE COURT:  And have you been satisfied with his
25    and Ms. Wagner's services in the case?
```

1          THE DEFENDANT:  Yes, I am.  I made corrections,

2    and they were made.

3          THE COURT:  Very well.

4          All right.  Hearing no objections, the Court

5    accepts the factual findings in the presentence

6    investigation report regarding the circumstances of the

7    offense; and, therefore, those facts as stated in the PSR

8    will be adopted by the Court for purposes of this

9    sentencing.

10          All right, moving to the guidelines calculation.

11    Before we get to the objections, let me just set out for the

12    record how probation approached the guidelines and the

13    calculations that it arrived at.  There are six counts of

14    conviction.  Five of them are subject to the guidelines.

15    Count 5 for disorderly conduct is a Class B misdemeanor; so

16    it's not covered by the guidelines.

17          Under 3D1.2(a) and (c), probation grouped Count 1,

18    which is obstruction of an official proceeding, Count 3,

19    entering and remaining in a restricted building, Count 4,

20    disorderly conduct in a restricted building, and Count 6,

21    obstruction of justice.  It grouped those counts either

22    because they involved the same victim, namely Congress, or

23    in the count of -- or in the case of Count 6, the

24    obstruction of justice count, the count embodied conduct

25    that is treated as either a specific offense characteristic

1    or an enhancement to another count in that group.

2          Probation did not group Count 2, which was

3    interfering with law enforcement during a civil disorder

4    because it involved a different victim, namely law

5    enforcement officers.

6          With respect to the grouped counts, probation

7    applied the guideline for 18 USC Section 1512(c)(2), which

8    is the obstruction of justice guideline set forth at

9    Guideline Section 2J1.2.  That offense carries a base

10   offense level of 14.  Probation applied two specific offense

11   characteristic enhancements:  one, 2J1.2(b)(1)(B), an

12   eight-level enhancement because the offense involved causing

13   or threatening to cause physical injury to a person, and a

14   three-level enhancement under 2J1.2(b)(2) because the

15   offense resulted in substantial interference with the

16   administration of justice.

17         Probation also applied adjustments for an

18   aggravated role in the offense and obstruction of justice.

19   The aggravated role enhancement is at 3B1.1(c).  Probation

20   added two levels for the defendant being an organizer,

21   leader, manager, or supervisor in the criminal activity, and

22   an additional enhancement at 3C1.1 for obstruction of

23   justice based on the destruction of the cell phones.  That

24   resulted in an adjusted offense level for those grouped

25   offenses of 29.

1          Probation went on to calculate the offense level

2     for Count 2, the ungrouped count, which resulted in an

3     offense level of 15.  Ms. Baker informs me that there may

4     have been a mistake in that calculation, and that the two-

5     level enhancement for obstruction of justice should not, in

6     probation's view, be included.  Is that correct, Ms. Baker?

7          THE PROBATION OFFICER:  Yes, Your Honor.

8          THE COURT:  Okay.  And so that count resulted in

9     an Offense Level 13, and because 13 or 15, as per the

10    original calculation, was more than nine levels below the

11    29, it is the 29 that controls.

12         The defendant has no criminal history.  Offense

13    Level 29 at Criminal History Category 1 results in an

14    advisory guidelines range of 87 to 108 months based on

15    probation's calculation.

16         Now, before we get to the objections to the

17    various enhancements that were applied, the government had

18    an objection to the approach of grouping the counts prior to

19    calculating the offense level for each individual count.  At

20    least that was the objection noted in your responses to the

21    draft presentence report, although in your memo you say that

22    the calculation would have resulted in the same guidelines

23    range, and so I'm not sure I need to deal with that issue

24    here.

25         Ms. Aloi.

1          MS. ALOI:  That's correct, Your Honor.  As to the

2     grouping, there's no need to address it because it comes out

3     in the wash once you do the calculation.

4          THE COURT:  So we should just move on to your

5     objections and the defense's objections to individual

6     enhancements.

7          MS. ALOI:  Yes, Your Honor.

8          THE COURT:  Okay.

9          So let's start with the government's objection.  I

10    believe, Ms. Aloi, you indicate that the government believes

11    that probation should have applied an additional two points

12    based on specific offense characteristics set forth at

13    2J1.2(b)(3)(C) for an offense involving otherwise-extensive-

14    in-scope planning and preparation.  Do you want to address

15    that?  And probation did not apply that enhancement.

16          MS. ALOI:  Yes, Your Honor.  In our final

17    sentencing submission we did not address that objection.

18    While we think that it arguably applies to the defendant's

19    behavior on January 6th and in the time leading up to it, we

20    are not asking for it to be included in the calculation

21    today.

22          THE COURT:  Okay.  Thank you.

23          Okay.  And finally, Ms. Aloi, does the government

24    also take the position that a second obstruction adjustment

25    enhancement at 3C1.1 -- I'm sorry, 3C1.1 Comment Note 8,

1    does the government take the position that that applies as

2    well?

3            MS. ALOI:  Your Honor, we take the same position.

4    I think there is an argument that it applies, but we are not

5    seeking it today.

6            THE COURT:  Okay.  Very well.  So we can move to

7    the defense's objections.

8            All right.  Mr. Rollins, why don't you approach.

9            Okay.  Let's start with the eight-level adjustment

10    under 2J1.2(b)(1)(B).  The offense involved causing or

11    threatening to cause physical injury to a person.

12            MR. ROLLINS:  Yes.  So if the Court recalls --

13            THE COURT:  You can take your mask off, if you're

14    comfortable doing it.

15            MR. ROLLINS:  As the Court recalls, we had a -- in

16    fact, I think there was a case produced regarding this same

17    issue with whether he was carrying a dangerous weapon or

18    using the dangerous weapon.  Here, 2J1.2(b)(1)(B), the

19    offense involves causing or threatening to cause physical

20    injury to a person or property damage to obstruct the

21    administration of justice.

22            What I see the government doing here or

23    requesting is that because he's carrying the walking stick

24    that somehow -- and I don't think there was any testimony --

25    there was an officer who had indicated that he got touched,

1    but it was clear he said he wasn't sure whether it was

2    intentional or mistake.  I think that was on cross.  But

3    there was no -- there was nothing to suggest that he had

4    used it to cause physical injury to a person or created any

5    property damage.

6          So the reliance on what the government's relying

7    on and what I read from the presentence writer as well, that

8    the -- after social media -- the conversations in social

9    media about some of the language that was used would suggest

10   that he would have or he had intended to use this weapon.

11   But, I mean, that really gets into theoretical -- I mean,

12   we're talking about what his actions were on that day in

13   using the actual walking stick.

14         THE COURT:  Okay.  Let me just cut to the chase a

15   little bit.  Obviously there was no physical injury.  There

16   was no use of the stick.  He was not charged with using the

17   stick.  He was not convicted of using the stick.  So the

18   operative language is whether his carrying of the stick --

19   let's put aside the comments, okay? -- constituted a threat

20   to cause physical injury to a person, all right?

21         And so I hear the government to argue that his

22   carrying the stick in the way that he did -- and we've all

23   seen the videos and the stills, and we sat through trial on

24   this very question, and the jury sent out notes on this very

25   question -- under this guideline, does that constitute a

1    threat to cause physical injury to those officers?

2            MR. ROLLINS:  And I would suggest it doesn't.  I

3    mean, if we would just kind of go through the officer's

4    testimony, and the government cited some of it in its

5    memorandum regarding the port arms and the use of it in port

6    arms, and I think they indicated that even in their

7    memorandum that it's used in sort of a blocking fashion or

8    almost a self-defense position.  It's not -- when you're

9    holding it in port arms, you're not using it in a

10   threatening manner but more of a self-defense action that

11   you could operate.

12           THE COURT:  Right, but he's blocking their path.

13   He's wearing a gas mask.  He's got a big old stick in his

14   hand, you know, and they have to go around him, and he makes

15   contact with the stick.

16           MR. ROLLINS:  Right.

17           THE COURT:  Would you not feel threatened if you

18   were an officer in that position given everything else that

19   was going on around you where there was physical violence

20   and fighting and hand-to-hand combat?

21           MR. ROLLINS:  So the officers -- and the

22   government is correct with the things that were going on

23   around them, with people throwing stuff and that.  But

24   looking at just this individual's actions of what he was

25   doing -- I understand the officer's taking the position and

1    the jury found that he was in a position of blocking or

2    preventing the officers from doing their job, and that's

3    what the jury found, but this wasn't -- this wasn't an issue

4    presented to the jury, that he was using it in such a manner

5    to threaten or harm the officer.

6            THE COURT:  We're not talking about using it.  Was

7    he holding it or carrying it in a manner that conveyed a

8    threat under all the circumstances to those officers in

9    front of him?  I think that's the question.

10           MR. ROLLINS:  Right.  And I think, if we just take

11   it from a common sense perspective, and that is if I'm

12   holding it at port arms -- if I'm holding it out here and my

13   arms are going -- extended outward or I'm using it in such a

14   manner.  But if it's up against my chest exactly as they

15   described it, in a port arms manner, that doesn't indicate

16   that one is using it in a threatening manner.

17           It's exactly as that officer described, that, when

18   someone's holding it in a port arms manner, it's almost a

19   defensive posture.  So I don't see how we get to the next

20   level of threatening by holding it in that position.

21           THE COURT:  Okay.  Ms. Aloi?

22           MS. ALOI:  Your Honor, the government's position

23   is that the eight-point adjustment applies for several

24   different reasons.  It certainly applies to the defendant's

25   own behavior that day.  As you correctly note, it does not

1    matter whether or not he used the stick so long as he was

2    threatening in his usage of it.

3            There is, in fact, trial testimony that the stick

4    made contact with the officers.  But taking a step back,

5    this actually applies not just to the civil disorder conduct

6    but to the conduct of that day writ large, and once you

7    incorporate the cross references in Section

8    1B1.13(a)(1)(A) --

9            THE COURT:  Hold on.  Hold on.  Give me that

10   reference again.

11           MS. ALOI:  Under 1B1.3 -- I'm sorry, I said "Point

12   1" earlier, I meant Point 3(a)(1)(A) -- the enhancement

13   applies when -- to both the defendant's actions but also

14   anyone to whom the defendant aided or abetted.  And by

15   blocking and interfering with the MPD officers who were

16   trying to move through the crowd on the west front of the

17   building, the defendant aided and abetted those rioters

18   immediately around him who were threatening and assaulting

19   those officers.

20           THE COURT:  I'm going to have you slow down just a

21   little bit.  Both for me and for Lisa.

22           MS. ALOI:  I apologize.

23           THE COURT:  Okay.  1B1.3(a)(1)(A), this is

24   relevant conduct.  So it says that the specific offense

25   characteristics shall be determined on the basis of the

1    following, and (1)(A) is acts and omissions committed,

2    aided, abetted, counseled, commanded, induced, procured, et

3    cetera, caused by the defendant.

4         It's still talking about the defendant's acts.

5    We're not attributing acts of other people to him, right?

6         MS. ALOI:  That's right, Your Honor, but in the

7    moment when the defendant was impeding the movement of law

8    enforcement officers, those MPD officers were also being

9    assaulted by the rioters in their very presence and in the

10   path of the defendant, and so his actions directly aided and

11   abetted those individuals in the mob who were threatening

12   and assaulting the officers as he impeded their movement.

13        THE COURT:  Right, but I don't read that to mean

14   that his impeding the officers means that he gets tagged,

15   under that enhancement or that specific offense

16   characteristic, for threats that somebody else made to those

17   officers.

18        MS. ALOI:  The government reads that

19   interpretation of -- reads 1B1.3(a)(1)(A) to encompass both

20   the defendant's own acts and omissions and those who the

21   defendant aided and abetted.

22        But the Court need not find that --

23        THE COURT:  So we can be talking about more than

24   threats.  There was actual physical injury under that view.

25        MS. ALOI:  That's right, but here you don't have

1    to find that to find that the defendant's own behavior was

2    threatening.  At trial you heard the testimony from the MPD

3    officers who felt fear of their own safety by the

4    defendant's own actions holding the wooden stick in their

5    faces, and, in fact, he did make contact with the officers.

6            I'd also note, and believe this is in our

7    briefing, that the defendant is responsible for acts of

8    others in jointly undertaking criminal activity if those

9    acts are within the scope of the jointly undertaken criminal

10   activity, in furtherance of it, or reasonably foreseeable.

11   It doesn't require evidence of preplanning or conspiracy.

12   In plain terms, it just applies in persons who acted in

13   unison to achieve a common goal.

14           Here, the defendant is responsible, in part, for

15   the jointly undertaken criminal activity of the crowd of

16   rioters he joined, who charged up the building, through the

17   scaffolding, and overcame the police line.  And taken

18   together, the defendant's own conduct, in conjunction with

19   those he aided and abetted, is clearly threatening to cause

20   physical injury or property damage in order to obstruct the

21   administration of justice.

22           THE COURT:  Okay.  I'm not sure if I accept your

23   sort of vicarious liability theory for this, but I will

24   apply the enhancement.

25           As I said, the question is whether the offense

1    involved a threat of physical injury.  A verbal threat is

2    not required.  I believe Judge Howell rejected that same

3    argument in the *Rubenacker* case.

4         While perhaps not aggressively threatening, as I

5    said, if I were an officer, I would have felt physically

6    threatened if I saw the defendant standing in front of me

7    with a backpack and a gas mask holding a stick at port arms

8    standing right in front of me and not moving out of the way

9    and making contact with it as I tried to organize a line to

10   fight off a violent mob.  I would consider that threatening

11   or menacing conduct.

12        In addition, the *Webster's* definition of "threat"

13   is an expression of intention to inflict injury.  That is

14   very close to the instruction that I gave the jury on

15   carrying a dangerous weapon, namely that they had to find

16   that the defendant, quote, carried the stick with the intent

17   to use it in a manner capable of causing serious injury.  In

18   my view, carrying a weapon with the intent to use it to

19   inflict injury is tantamount to expressing an intention to

20   inflict injury, which is the dictionary definition of

21   "threat."  So I believe the enhancement applies.

22        That's not to say, Mr. Rollins, that you cannot

23   argue that the Court should -- could vary based on the

24   extent and nature of the threat in this case, but we can get

25   there later in connection with the sentencing factors, okay?

1          Mr. Rollins, you also objected to the application

2     of 2J1.2(b)(2) regarding substantial interference with the

3     administration of justice.  Do you want to press that

4     objection, or no?

5          MR. ROLLINS:  Yes.  I was just --

6          THE COURT:  Take your time.

7          MR. ROLLINS:  So in this 3C1.1, the directing or

8     procuring another person to destroy or conceal evidence that

9     is material to the investigation or judicial proceeding --

10          THE COURT:  Wait, let's get to 2J1.2(b)(2) first,

11     the substantial interference with the administration of

12     justice.

13          MR. ROLLINS:  Oh, I'm sorry, yes, 2J1.2, the

14     offense resulted in a substantial interference with the

15     administration of justice.  And I think I cited some cases

16     here in reference to that charge that the enhancement does

17     not apply when the government fails to identify any expenses

18     in addition to the costs of bringing the defendant to trial.

19          Here, while this -- and I think, as I stated,

20     there's no question that there's been a substantial amount

21     of money expended in this trial, this case, but I think,

22     when they're referencing substantial interference -- and

23     there's actually a premature or improper termination of a

24     felony investigation, and I think this even went to when

25     someone has caused that investigation to spend more money

1    such as lying to officers or lying to the FBI to where

2    they're committing perjury, and then the government has to

3    spend more money to kind of go around those lies, and I

4    think that's exactly what that enhancement applies to.  And

5    the government hasn't cited anything in this case that would

6    show the unnecessary expenses of resources based on anything

7    that he did.

8              So I understand that where they're going to

9    probably come to is those cell phones and sort of say, well,

10   the cell phones.  But the reality is the cell phones doesn't

11   change the -- the only thing it did was -- if we believe

12   what the government said, and that is that he destroyed the

13   cell phones, that didn't change how they proceeded in this

14   trial.  In fact, that count was added at the last, I think,

15   two weeks before the trial started.  So that would be the

16   only thing that they could come back and say that somehow

17   substantially interfered with justice, but that wasn't so in

18   this case.

19             THE COURT:  I think the argument, Mr. Rollins, is

20   that the thing that was interfered with was the

21   certification of the vote, and there was both a delay in the

22   certification as a result of the riot, and then substantial

23   costs were incurred to respond to the damage caused by the

24   riot.  I don't think the theory is linked to the cell

25   phones.

1        MR. ROLLINS:  So -- but -- and I guess that goes

2   to -- they're asking to -- and I think it comes to that

3   substantial interference, the definition of what that truly

4   means, and it's defined as a premature or improper

5   termination of a felony investigation.

6        THE COURT:  That's just one example, right?

7        MR. ROLLINS:  An indictment or other judicial

8   determination based on perjury, false testimony, or false

9   evidence, or the unnecessary expense of substantial

10  government and court resources.

11       The charge itself was obstructing Congress, and by

12  adding that word "substantial interference," and if we take

13  the definition of what "substantial interference" means,

14  that doesn't apply here at all.  I don't see how that would

15  apply because it almost -- and the cases that I read on this

16  basically it's almost to the after -- what happens after the

17  actual obstruction occurs, not necessarily before.  That's

18  why I think a lot of the cases go to the perjury count and

19  talk about perjury in relation to substantial interference

20  of government resources.

21       But, again, the government's identifying the

22  costs, and I read their costs relating to the case, but that

23  wasn't done after the fact.  That was actually in the --

24  that's the act itself.  It doesn't have to do with anything

25  that occurred afterward.  And I think that's what this

1      enhancement is requiring, substantial interference with the

2      administration of justice, but apparently like after the act

3      occurs, and you do something that's causing additional

4      resources for the government to spend to get to that point.

5              THE COURT:  Okay.  Ms. Aloi.

6              MS. ALOI:  Thank you, Your Honor.

7              I think the defendant here is missing the mark.

8      He was convicted of obstructing the election certification,

9      and as a result of the January 6th event, the official

10     proceeding of Congress's joint session, which was required

11     by the Constitution and the federal statute, had to be

12     halted while legislators were physically evacuated for their

13     own safety.  That is -- I don't see a scenario in which that

14     is not substantial interference with the administration of

15     justice.

16             And here, even under the narrow construction

17     proposed by the defendant, he appears to concede that the

18     government had to expend additional resources given the

19     attack, and so it applies.

20             THE COURT:  Okay.  The Court finds that the

21     enhancement applies.  The offense did result in a

22     substantial interference given both the delay that the riot

23     caused in the certification proceeding, which is the

24     proceeding at issue, and the expenditure of substantial

25     resources that was necessary to fix the damage that was done

1    to the Capitol.  That finding is consistent with findings of

2    Judge Moss in the *Matthew Miller* case and Judge Howell in

3    the *Greg Rubenacker* case where that enhancement was applied

4    as well.

5           And then finally, Mr. Rollins, 3C1.1, the

6    obstruction of justice enhancement.  Are you challenging

7    that?

8           MR. ROLLINS:  Yes.  This is the 3C1.1 obstructing

9    administration of justice, directing or procuring another

10   person to destroy or conceal evidence that is material to an

11   official investigation or judicial proceeding or attempting

12   to do so.  In this, I believe, the government's relying on

13   the fact that somehow they believe that Mr. Robertson's the

14   lead here; and, therefore, he is directing another person

15   to -- and I assume that person they're referencing is

16   Mr. Fracker.  That's my understanding of what the government

17   is trying to say there; because Mr. Robertson provided the

18   transportation, that somehow he was in a leadership role.

19          But when I read Mr. Fracker's statement, it

20   essentially says just the opposite, and Mr. Fracker is

21   saying that he takes responsibility for his own actions, and

22   that Mr. Robertson did not cause him to do anything that he

23   didn't want to do that day.  So I don't see how the

24   government's showing some form of -- that he's a leader.

25          THE COURT:  Again, I think we're talking past each

```
 1    other.  This is the obstruction of justice two-point
 2    enhancement under 3C1.1, which doesn't relate -- as I
 3    understand it, Ms. Baker -- to his recruiting of Mr. Fracker
 4    or his organization of Mr. Fracker, but rather to his
 5    destruction of the cell phones, which he was convicted of.
 6              MR. ROLLINS:  Oh, I'm adding on 3B1.1, which is
 7    directing or procuring another person.
 8              THE COURT:  Okay.  That was an aggravating factor
 9    that was also applied.
10              THE PROBATION OFFICER:  Yes.
11              THE COURT:  Okay.  So you're not objecting to the
12    plus two for obstruction of justice, but the plus two for --
13              MR. ROLLINS:  The leadership role.
14              THE COURT:  -- the leadership role.
15              Okay.  Go ahead.
16              MR. ROLLINS:  And as I stated, it wouldn't take
17    the Court more than to look at Mr. Fracker's own statements
18    to realize that there wasn't essentially a leader here.  The
19    position that Mr. Robertson drove the vehicle to Washington,
20    D.C., that day or the position that somehow he operated in a
21    leadership role over Mr. Fracker I think is misplaced,
22    especially given Mr. Fracker's own statements to the Court
23    regarding what he takes as his own responsibility, and even
24    what he said on the stand as to his own responsibility as to
25    what happened that day.  And I don't see how the
```

1    government's proving that somehow Mr. Robertson was in a

2    leadership role.

3            THE COURT:  All right.  Well, the provision is

4    written in the disjunctive.  He could have been an

5    organizer; he could have been a leader; he could have been a

6    manager; or he could have been a supervisor.  So leaving

7    leadership out and focusing on organizer:  He provided the

8    transportation.  He bought the gas masks.  He drove the

9    truck.  He bought the meals ready to eat, right?

10            MR. ROLLINS:  Right.

11            THE COURT:  That's not organization?

12            MR. ROLLINS:  Well, that's organizing.

13            THE COURT:  And it's not just Fracker, but it's

14    the neighbor as well.

15            MR. ROLLINS:  But that may be organizing a trip

16    because you all have planned a trip to go to Washington,

17    D.C., that day to engage in the rally.  But when you

18    really look back and consider his actions that day and that

19    Mr. Fracker -- and if we're just talking about Fracker, I'm

20    not talking about the neighbor -- Mr. Fracker goes into the

21    building first, and so to say that somehow he's organizing

22    or that he's created this scene because he's the organizer

23    when -- Mr. Fracker goes into the building first.

24            And there was no testimony that Mr. Fracker said

25    or he said, "Go in the building" or "This is what I think we

1    should do."  There wasn't that.  In fact, Mr. Fracker says

2    there was no planning.  I think he used a "we were at a

3    stoplight and everyone says go," something to that extent,

4    but not that Mr. Robertson has somehow organized this so...

5             And there's nothing to suggest that he organized

6    this other than he had the gas mask, they drove to

7    Washington, and he was just prepared.  And I think maybe

8    they're considering preparing and organizing the same thing,

9    but I don't believe they are.  I think he's just prepared.

10   He's not organizing.  He's not doing something to concert or

11   put together this crime.

12             THE COURT:  Okay.  Ms. Aloi.

13             So you say in your papers a number of times that

14   he recruited Mr. Fracker, and I don't recall the evidence of

15   that at trial.

16             MS. ALOI:  Your Honor, at trial -- I can give you

17   the citation.  It was on April 6th at Page 691.  Mr. Fracker

18   testified that the defendant had invited him to go with him,

19   and that he would not have gone had the defendant not

20   invited him.

21             The government also has information that the

22   defendant invited other folks at the police department as

23   well, that he was organizing people within the police

24   department where Mr. Fracker was a subordinate and he was a

25   sergeant, to attend -- to participate in the criminal

1    activity.

2              THE COURT:  Okay.  And what about the other

3    organizational aspects of the trip?  Is Mr. Rollins -- is he

4    correct or incorrect that just getting the gas and providing

5    transportation doesn't count, and it has to be something

6    related to once they got here?

7              MS. ALOI:  Well, once they got here, they moved

8    in tandem, and Mr. Fracker testified that he agreed with

9    the defendant to go inside the building where they

10   participated --

11             THE COURT:  Just being with a group of friends

12   can't be leadership, right?  I mean, then everybody would be

13   a leader.  He's got to show something more than that.

14             MS. ALOI:  It was the defendant's leadership that

15   got Mr. Fracker and the neighbor there that day.  That's why

16   it was significant that he drove them, provided the gas

17   masks, provided the supplies, the MREs, which was

18   identified.  He paid for the MetroCards after they parked

19   the car in Virginia.  He took all of the actions necessary

20   to put Mr. Fracker at the Capitol that day.

21             THE COURT:  Okay.

22             All right.  While I would not have applied the

23   extra two points for substantial leadership that the

24   government indicated that it would press for, I will apply

25   the two points based on his organization of the trip, the

1   transportation, the provisions, his inviting and I think

2   it's probably fair to say recruiting Mr. Fracker and others

3   for the trip even though he may not have demonstrated much

4   of a leadership role once they were at the Capitol.

5           All right.  So I think that that's all of the

6   objections, Counsel.

7           MS. ALOI:  Your Honor, if I could just note, the

8   government objects to probation's calculation declining to

9   add the obstruction points on the civil disorder count.  I

10  would -- I just want to note it for the record.  The cell

11  phones that were destroyed contained evidence of --

12          THE COURT:  I'm sorry, that's Count 2?

13          MS. ALOI:  That's right.

14          THE COURT:  So the ungrouped count.

15          MS. ALOI:  That's right.  At the start of this

16  proceeding you had noted that probation had a mistake in the

17  PSR, and that mistake was applying the obstruction to that

18  count.

19          THE COURT:  Okay.

20          MS. ALOI:  But the government's position is that

21  it does apply because the cell phones contained evidence of

22  the participation in the civil disorder and that the

23  defendant collected the cell phone from Mr. Fracker to

24  destroy it.

25          THE COURT:  Okay.  Ms. Baker, would you like to

 1    address that now, or do you want to consider that in

 2    redrafting or revising the PSR?  I know that there may be a

 3    pagination or a paragraph numbering issue anyway where

 4    you're going to have to revise it in any event.

 5            MS. ALOI:  Just the types of information that are

 6    on the cell phone are things like location history and

 7    contacts as well as the photos.

 8            THE COURT:  Okay.

 9            THE PROBATION OFFICER:  So good afternoon, Your

10    Honor.

11            THE COURT:  Good afternoon.

12            THE PROBATION OFFICER:  Yes, as noted, the

13    paragraph numbers mistakenly are off.  When we did the

14    guideline analysis, it threw the numbers off so I would ask

15    the Court the latter, what the Court has suggested or

16    mentioned to consider it.

17            THE COURT:  And you can consider and address

18    Ms. Aloi's comments today on that.

19            THE PROBATION OFFICER:  Yes.

20            THE COURT:  For purposes of the proceeding today,

21    since Count 2 doesn't affect the overall adjusted offense

22    level, consistent with the Court's findings, the Court

23    agrees with probation that the base offense level is -- the

24    total offense level is 29.  The defendant has no criminal

25    history so Criminal History Category 1.  That results in an

1    advisory guidelines range of 87 months to 108 months.

2            Probation has recommended a period of

3    incarceration of 96 months on the grouped count, 60 months

4    on the ungrouped count, Count 2, and six months on the

5    nonguideline count all to run concurrently resulting in a

6    total recommendation of 87 to 108 as well as three years of

7    supervised release.

8            The government makes essentially the same

9    recommendation plus a figure of $2,000 restitution.

10            All right.  Any objections, Counsel?  Did I get

11    anything wrong?  Your objections to the enhancements are

12    noted for the record.

13            MS. ALOI:  The government has nothing further with

14    regard to the guidelines calculation.

15            THE COURT:  Okay.  Mr. Rollins.

16            MR. ROLLINS:  We just stand by our objections.

17            THE COURT:  Very well.

18            All right.  Ms. Aloi, do you want to address the

19    sentencing factors?

20            MS. ALOI:  Thank you, Your Honor.  Could we --

21    would you mind moving it over to the ELMO?

22            THE COURT:  Sure.  Do you need some time to set

23    up?

24            MS. ALOI:  No.  I would just hope to use the ELMO,

25    but I can't actually see it on the screen.

```
 1              THE COURTROOM DEPUTY:  Because it's not on.

 2              THE COURT:  There we go.

 3              MS. ALOI:  Okay.  Thank you, Your Honor.

 4              THE COURT:  Is that displayed in the gallery?

 5    Ms. Jenkins, do you want to --

 6              THE COURTROOM DEPUTY:  Not yet.

 7              THE COURT:  Okay.

 8              THE COURTROOM DEPUTY:  Go ahead.

 9              MS. ALOI:  Can it be seen in the gallery?

10              I think we can proceed with it on one side, if

11    that's amenable to the Court.

12              THE COURT:  Right, unless there's a quick fix.

13    And if you folks on my right want to move over, feel free

14    to.

15              MS. ALOI:  Okay.  We can just proceed.

16              THE COURT:  Okay.

17              MS. ALOI:  Your Honor, Thomas Robertson, a police

18    sergeant for the town of Rocky Mount, Virginia, joined the

19    mob which attacked the U.S. Capitol to disrupt the peaceful

20    transition of power on January 6th.  As the evidence showed

21    at trial, he used his law enforcement and military training

22    to block MPD officers attempting to hold the mob back.  He

23    destroyed evidence by gathering and tossing into a lake the

24    cell phones that he and Co-Defendant Fracker used on January

25    6th, and he was convicted at trial of all six counts with
```

1    which he was charged for this conduct.

2            When he was arrested, he showed an utter disregard

3    for the rule of law by flagrantly ignoring the conditions of

4    his release by trafficking in firearms, and only a

5    significant sentence of incarceration will ensure that he

6    does not reoffend.  For his efforts to impede law

7    enforcement, overturn the election results, and destroy the

8    evidence, this Court should sentence Defendant Robertson to

9    a guidelines sentence of 96 months incarceration.

10           Now, this Court must consider the factors set

11    forth in 18 USC 3553(a) in crafting a sentence.  One of

12    those factors is the nature and circumstances of the

13    offense.  I know Your Honor sat through the testimony, but I

14    just want to briefly remind the Court of the evidence that

15    the jury saw.

16           The defendant's calls for violence started

17    immediately after the election; not, as the defendant

18    claims, in late November.  In his letter to the Court, the

19    defendant blames his radicalization on a person suffering

20    from a terminal illness that he didn't even know about until

21    weeks after this statement.  A legitimate --

22           THE COURT:  How do we know that?

23           MS. ALOI:  This is a Facebook post.  It was dated

24    November 7th, so immediately after the election.

25           THE COURT:  But how do we know when the friend was

1    suffering from cancer?

2         MS. ALOI:  It was in the letter that he submitted

3    to the Court.

4         THE COURT:  Okay.

5         MS. ALOI:  So "A legitimate republic stands on 4

6    boxes.  The soap box, the ballot box, the jury box, and then

7    the cartridge box.  I cannot speak for others, but being

8    disenfranchised by fraud is my hard line.  I've spent most

9    of my adult life fighting a counter insurgency.  I'm about

10   to become part of one."

11        The defendant came prepared for violence.  He

12   brought gas masks, MREs, and the large wooden sticks.  He

13   brought the gas masks for him and his friends.

14        And here's another example of what he was prepared

15   for.

16        "Civility has left me.  I won't be

17   disenfranchised.  I'll follow the path our founders gave us.

18   Redress of grievances (already done), civil disobedience

19   (here now) and then open armed rebellion.  I'm prepared to

20   start one here and know a bunch of like minded and trained

21   individuals."

22        Those like-minded and trained individuals, those

23   are two of the people he recruited to join him that day.

24        As you saw, he used his baton in military training

25   to threaten the officers to stand in port arms and impede

1    them when they were there to assist.  And in case there can

2    be no doubt, he made contact with the officers.

3           As you can see here and as the trial testimony

4    showed, he did not stand back.  He did not get out of their

5    way.

6           And then, when all was said and done, he took a

7    victory lap.  He and Defendant Fracker took a selfie photo,

8    an obscene selfie photo, in the Capitol's Crypt.

9           And here's what the defendant had to say about his

10   conduct on January 6th.  "Here's the picture in question" --

11   the one you just saw -- "and I am fucking PROUD of it.  It

12   shows 2 men willing to actually put skin in the game and

13   stand up for their rights.  If you are too much of a coward

14   to risk arrest, being fired, and actual gunfire to secure

15   your rights, you have no words to speak I value.  Enjoy your

16   feel good protests and fame.  I'll simply accept a 'Thank

17   you' for the very blanket of freedom that you live and sleep

18   under."

19          And that's actually not all he had to say about

20   his conduct on January 6th.  Another quote from the trial

21   presentation:  "CNN and the Left are just mad because we

22   actually attacked" -- not protested -- "attacked the

23   government who is the problem and not some random small

24   business.  The Left rioted all Summer and just burned their

25   own neighborhoods, assaulted numerous civilians, and

1    destroyed and looted small family owned stores.  The Right

2    IN ONE DAY (without weapons) took the fucking US Capitol.

3    Keep poking us."

4            And that's not all.

5            "A government scared of its people.  The pictures

6    of them huddled in the floor crying is the most American

7    thing I have ever seen.  Regardless of what else happens

8    those senators and Congressmen now understand who they truly

9    are accountable to in the end.  They have paid lip service

10   to 'Working for the people' for so long its become a hollow

11   phrase.  They have been reminded...we...not Antifa.  Stormed

12   it."

13           The defendant is by all accounts proud of his

14   conduct on January 6th.

15           THE COURT:  And, again, remind me when these

16   statements were made?

17           MS. ALOI:  The first statement that you saw was

18   made on November 7th.  In the defendant's letter he said

19   that he started caring for his friend, which radicalized

20   him, on November 20th, several weeks later.

21           The next statement that you saw was made on

22   December 19th.  That is the one about recruiting a bunch of

23   like-minded and trained individuals.

24           And then the other ones were taken almost

25   immediately after the rioting, in which he is remarking on

1    the -- I'm sorry, the attack on which he's remarking on the

2    picture that had been posted of him and Mr. Fracker in the

3    Crypt.

4             THE COURT:  Okay.

5             MS. ALOI:  I'd like to take another moment to

6    remind you of some of the other evidence that the jury saw.

7             The defendant submits in his sentencing

8    presentation or his package for the Court that he did

9    not destroy the cell phones, and he blames his conduct on

10   Mr. Fracker despite all evidence to the contrary.  These are

11   the text messages that were found on his new phone following

12   its seizure.  And this is from January 15, 2021, so

13   contemporaneous with the occurrence.

14            "Anything that may have been problematic is

15   destroyed."

16            "Including my old phone."

17            "Took a lake swim."

18            "And later had a tragic boating accident."

19            "They asked for my phone but I'm not a retard."

20            That is what the defendant had to say about law

21   enforcement's investigation of this case.

22            The Court has to consider the need for deterrence

23   and respect for the rule of law when deciding the

24   defendant's sentence.  As you just saw, the defendant

25   continued to call for violence after his arrest and the

1    charges, but they weren't limited to his public Facebook

2    post.

3            I want to draw your attention to some texts

4    between the defendant and his friend Deacon.  This is the

5    very same Deacon who submitted the letter to the Court

6    citing the defendant's good character.  These were provided

7    in unredacted form to the Court and the defendant earlier

8    this week.

9            This is March 10, 2021, and a note to Deacon and

10   others.

11           THE COURT:  I'm sorry, Deacon is a member of the

12   couple who mentored or quasi adopted him?  Is that --

13           MS. ALOI:  I do not believe he is a member of that

14   couple.

15           THE COURT:  Okay.

16           MS. ALOI:  I think he is part of a conversation

17   with that couple in this text thread.  He submitted a letter

18   on his behalf.

19           "This is not a suicide note or anything crazy like

20   that but I swear to you both that you will never hear of me

21   surrendering to be a political prisoner, and I will make

22   them pay dearly, and think twice before coming for anyone

23   else."

24           "I love you guys.  I'm not planning on doing

25   anything crazy but I am done being civil about it.  If they

1   come here again, many will die.  Possibly by [sic] me,

2   definitely many of them.  I am not thinking crazy.  I am not

3   going insane.  I'm done.  They seem to be pressing a war,

4   and I aim to give them more than they want."

5             "I can kill every agent that they send for

6   probably 2 weeks.  Maybe longer.  One man.  If they start to

7   realize that it will stop the bullshit tyranny."

8             And the context for this are the seizures that

9   were occurring at the defendant's house of his firearms

10   arsenal contemporaneous with his arrest and after he was

11   ordered not to have any firearms.

12            Later on the thread, they're discussing a meme.

13   The meme says -- it's hard to see here, but it says in the

14   caption, "Never fuck with someone who is prepared to die in

15   battle," to which the defendant responds, "They may get the

16   chance.  Call me an insurrectionist so many times and I will

17   oblige you."

18            This occurs after his arrest.

19            A significant sentence is needed to keep this

20   defendant from offending again.  He has no respect for this

21   Court's order and nothing in his behavior suggests that he

22   will be deterred from participating in future misconduct.  I

23   know his disregard for the Court's orders has been well

24   documented before the Court, but I think it's worth the

25   reminder.

1            Title 18 United States Code Section 922(n) makes

2     it unlawful for any person who is under indictment for a

3     crime punishable by imprisonment for a term exceeding one

4     year to ship or transport in interstate or foreign commerce

5     any firearms or ammunition.  The defendant, he was a police

6     officer.  He's aware of what the law requires, and here is a

7     list of firearms that he shipped using a federal firearms

8     licensee in Virginia while under felony indictment.  You'll

9     get a sense of the volume.

10           THE COURT:  Okay.  Obviously the Court is aware of

11    this issue.  It was the subject of a motion for revocation

12    of his conditions of release, which the Court granted.  Has

13    he been charged with that offense?

14           MS. ALOI:  That matter remains under

15    investigation.

16           THE COURT:  Okay.

17           MS. ALOI:  And I have also the lab report showing

18    by a preponderance of the evidence that he possessed an

19    explosive device at his home after being ordered not to.

20    This is also in evidence -- in the Court's record at 36.1.

21           THE COURT:  Okay.  Tell me more about that.  If I

22    recall correctly, there was a suggestion by the defense that

23    this was part of some sort of training mechanism.  He had

24    provided training for other law enforcement, and this was a

25    demonstration device that was not operable.  Did the FBI

1    analyze that, and did it come to a different --

2           MS. ALOI:  The defendant just continues to make

3    excuses for his behavior.  Even were it --

4           THE COURT:  Well, he was a -- he did train folks

5    in firearms use, correct?

6           MS. ALOI:  Yes, and you would think that his

7    training would have informed him of the way in which these

8    items are supposed to be secured.

9           First off, the government has no information to

10   suggest that it was, in fact, a training device.  But even

11   were it a training device, it was improperly stored, and

12   here in the lab report it details the items that were found

13   and the ways in which they are used to make explosive

14   devices.  And this is an independent offense beyond the

15   possession of firearms or the shipping firearms in

16   interstate commerce because there's very specific means by

17   which law enforcement and other individuals are required to

18   store and maintain explosive devices.

19          And, again, that's even --

20          THE COURT:  I just want to be clear for purposes

21   of sentencing.  The implication is when joined up with the

22   text that you just read and the prior seizures of his

23   weapons by FBI agents, that this may have been some sort of

24   booby trap or device that he intended to deploy if they came

25   back.

1          So the natural questions are, you know, was it

2    operative?  Was it a training device or a real device?  You

3    know, if it wasn't operative, could it have been activated

4    within a short period of time?

5          What implication should I draw from the thing that

6    is pictured here?

7          MS. ALOI:  Your Honor, I think the implication you

8    should draw is that this speaks directly to the 3553(a)

9    factors concerning the defendant's likelihood to reoffend or

10   the need for deterrence and also the defendant's disregard

11   for the rule of law.

12         While he certainly engaged in numerous texts

13   suggesting that he was planning for future violence,

14   including against the FBI agents who had seized his house

15   and other individuals who he caused --

16         THE COURT:  Seized items from his house.

17         MS. ALOI:  I am not here saying at this time that

18   this particular device was to be used against the agents.

19         THE COURT:  Okay.

20         MS. ALOI:  Just that it is evidence that he was

21   amassing an arsenal of illegal weapons, illegal firearms.

22   And the lab report has been provided to the Court.

23         THE COURT:  Which I've reviewed.

24         MS. ALOI:  The defendant also has a track record

25   of lying about his military service.  He does this to both

1    his employer, his friends, and the news media.  And just on

2    the same consideration with regard to the rule of law, the

3    Stolen Valor Act makes it a crime to benefit by making false

4    statements about military awards.

5            On January 11th, just a few days after the attack,

6    in an effort to publicly assert that his own role in the

7    insurrection was peaceful and law abiding, the defendant

8    bragged to a reporter that he achieved the rank of Sergeant

9    First Class E7 and sent a photo that he claimed to be of

10   himself adorned with a Purple Heart.  Those photos are in

11   the sentencing materials.  He did this even though he knew

12   he was discharged from the Army at the rank of Specialist E4

13   and was never awarded a Purple Heart.

14           THE COURT:  Can you tell me whether that's under

15   investigation as well?

16           MS. ALOI:  I cannot comment further on the status

17   of criminal investigations.

18           The victim impact of the defendant's crimes are

19   also not insignificant.  As you heard at trial, the officers

20   had to physically move the defendant out of their way to get

21   through in furtherance of their own duties to try to secure

22   the Capitol.  His stick struck two separate CD 42 officers

23   as they tried to move past.

24           Each rioter's actions that day were illegal and

25   contributed directly or indirectly to the violence and

1    destruction.  As a judge in this court recently stated, a

2    mob isn't a mob without the numbers.  The people who are

3    committing these violent acts did so because they had the

4    safety of numbers.

5          And briefly, I just want to take a few more

6    minutes to respond to some of the defendant's sentencing

7    materials.

8          The defendant provided the Court with letters from

9    several character witnesses.  They don't really appear to

10   know him, and they didn't see the evidence that the jury

11   saw.  They seem collectively to continue the denial and

12   failure of the defendant to take responsibility for his

13   conduct.

14         He also included a letter, which I've referenced,

15   attempting to explain his side of the story, but it's

16   riddled with falsehoods.  Some of those are detailed in our

17   memo.

18         I just think it's worth emphasizing here that

19   truth has no meaning to this defendant.  He'll say whatever

20   he thinks he needs to say to make excuses for his conduct.

21   He blamed his conduct in part on his wife's absence even

22   while he was out cavorting with other women.  He blamed a

23   friend who was sick, which is just wildly inappropriate.

24   And he blamed his co-defendant, Fracker, for destroying the

25   phone even though the text messages, as you just saw,

1    clearly state otherwise.  He is simply not credible.

2          Going back to his military service for a moment.

3    In his letter he mentions serving from 2005 to 2011,

4    including deployment to Afghanistan and Iraq, and he

5    suggests that he was severely wounded in furtherance of that

6    service.  But he was discharged from the military in 2009

7    and his total active duty time is only one year and four

8    months.

9          It should come as no surprise, though, that the

10   defendant exaggerates his military service.  He has a long

11   history of lying about it.

12         THE COURT:  Let's stop there.  He was certainly

13   wounded.  Do you contest that?  And the --

14         MS. ALOI:  I don't contest he was wounded, but he

15   wasn't wounded while in active duty.  He was a contractor.

16   And so his materials suggest that he was in active service

17   when he was wounded.  He was wounded later in the region

18   working as a contractor.

19         THE COURT:  Okay.

20         MS. ALOI:  In evidence at trial were

21   representations that the defendant made to the city of Rocky

22   Mount, Virginia, in support of his application for

23   employment with the police department, so this is some

24   number of years ago.  The defendant identified himself in

25   his resume to be a U.S. Army Ranger School graduate.  In

1    written filings by counsel, he made similar representations

2    to this Court.

3            For example, in ECF 31 the defendant filed

4    pleadings that said that he served in the United States

5    Army, became a Ranger and sniper school graduate.  The

6    government's reviewed the defendant's official military

7    records and confirmed that he is neither an Army Ranger nor

8    a graduate of the U.S. Army School.

9            He is simply not credible both with regard to what

10    happened on January 6th and whether or not he can be relied

11    on to respect the rule of law in the future.

12            And going back for a moment, Your Honor, about his

13    injury, we note this in our sentencing materials, but

14    there's even a discrepancy in his materials as to when he

15    was cleared for work for the police department.  It was

16    earlier than he represented, which is evidenced by his own

17    record, and so the falsehoods are permeated throughout.

18            And notably, and I think this is important for the

19    Court's consideration, the defendant lied to his co-

20    defendant, a former U.S. Marine and his subordinate officer

21    at the Rocky Mount Police Department.  He lied about his

22    military service, and he used those lies to envelop himself

23    in a cloak of credibility, to imbue himself of leadership

24    authority, all of which influenced Co-Defendant Fracker's

25    friendship with his former mentor and ultimately Fracker's

1    decision to join the defendant at the Capitol.  These lies

2    to Fracker continued even after the defendant's arrest at

3    the same time that the defendant was paying Mr. Fracker

4    upwards of $30,000 following their arraignment.

5         And here, for the Court, I have a text from the

6    defendant to Mr. Fracker.  It is dated March 15, 2021, and

7    it says "Recognizing that I volunteered for a Ranger, fully

8    knowing the hazard of my chosen profession.  I will always

9    endeavor to uphold the prestige of my chosen Ranger

10   regiment."  That is a lie.

11        For his participation in the January 6th attack on

12   the Capitol and considering the 3553(a) factors, including

13   the need for the sentence to reflect the rule of law and

14   provide specific and general deterrence and the cover-up and

15   his complete disregard for this Court's authority, the

16   government recommends that the Court impose a 96-month

17   sentence.

18        THE COURT:  Okay.  Address the eight-level

19   enhancement.  Obviously that's doing a lot of work here,

20   right?

21        MS. ALOI:  So --

22        THE COURT:  Without the enhancement, the range

23   would be 37 to 46, which is less than half of what it is

24   now.  It would take him from a 29 to a 21.

25        When I read the notes to that enhancement, it says

1    that -- you know, it acknowledges that it encompasses a wide

2    range of conduct from a mere threat to extreme violence, all

3    right.  I've applied that enhancement.  I agree that it

4    should apply, but I think the commission itself acknowledges

5    that there's a lot of conduct that might qualify for that

6    eight.

7            So the question is, you know, without any physical

8    violence -- I know it touched the officer, okay?  But he

9    didn't hit the guy with it, all right.  Without any

10   expressed verbal threats -- and there have been folks where

11   that enhancement has applied who have threatened Minority

12   Leader McConnell or Speaker Pelosi.  I think Mr. Reffitt

13   falls in that category.

14           You know, there's a broad range of conduct.  Why

15   should the Court not at least vary?  And I get there may be

16   other factors that the guidelines don't take into account

17   that might be aggravating, but just focusing on that, why

18   should the Court not vary because there was no violence,

19   there was no explicit threat, there was no overt, you know,

20   movement of the stick.  You see my point, right?

21           MS. ALOI:  Your Honor --

22           THE COURT:  How should I assess his conduct?  And

23   we agree on what the conduct is.

24           MS. ALOI:  So his conduct certainly does not

25   warrant a variance here.  For starters, I think you can --

1           THE COURT:  So any Court should apply eight

2    regardless of whether it is actual physical violence or a

3    mere threat?

4           MS. ALOI:  Well, here I think you have to look at

5    the threat and moment in the context of the other

6    statements, both before and after.  This is not a situation

7    where you could say that this defendant was accidentally

8    threatening.  He came with the intention of being violent,

9    and all his conduct after the fact just enforces that point.

10          It was his intention to be threatening that day in

11   order to obstruct the administration of justice.  It's why

12   he brought his gas masks.  It's why he brought the gas masks

13   for his friends.  It's why he brought the large wooden

14   stick, and it's why he lied about the stick on the day of

15   the law enforcement searches.

16          It is not an accident that he was in the position

17   that he was threatening those officers.  If you recall from

18   the trial presentation, at the very moment that this is

19   going on those officers are fully under attack.

20          THE COURT:  Okay.  Let me ask the question this

21   way.  Are there any circumstances under which a Court should

22   consider a variance because that -- because all eight levels

23   overstates the seriousness of the defendant's conduct?  Any

24   circumstances?

25          MS. ALOI:  Your Honor --

```
 1              THE COURT:  Or is eight eight in all cases?

 2              MR. ALOI:  Your Honor, I am not here today to

 3    speak to the other hundreds of rioters who were there at the

 4    Capitol.  What I can say is applying it to this defendant is

 5    completely consistent with how it has been applied for

 6    similarly situated defendants.  And I note, Mr. Reffitt got

 7    it, and he didn't even enter the building, and many

 8    defendants --

 9              THE COURT:  No, but he made specific threats

10    against the speaker and minority leader.

11              MS. ALOI:  Yes, querying whether or not those

12    threats were as physical as Defendant Robertson's --

13              THE COURT:  I understand.

14              MS. ALOI:  -- but also many of the defendants

15    who have agreed, by plea agreement, to accept the eight

16    points acknowledging their behavior, and so to apply any

17    variance here based on this defendant's behavior with this

18    defendant -- with the context for his actions would create a

19    disparity.

20              THE COURT:  Okay.  Anything else?

21              MS. ALOI:  No.

22              THE COURT:  All right.  Mr. Rollins, you're on.

23    Ms. Wagner left you to your own devices today?

24              MR. ROLLINS:  Yes.  She had another hearing in

25    Superior Court.
```

```
 1              THE COURT:  Give her my best.

 2              MR. ROLLINS:  Thank you.

 3              So I'm going to start with the nature and

 4    circumstances of the offense.  We already know the facts of

 5    this case backwards and forwards, and even his letter to the

 6    Court acknowledges the nature of the offense and

 7    acknowledges what he did on that day.  Now, there is always

 8    going to be this dispute about whether there's an

 9    obstruction of Congress, which he still stands by that was

10    never his intent when he went in there.

11              But the nature and circumstances of this case are

12    all on video, to the point to where we see Mr. Robertson

13    carrying the stick in port arms.  We never see him use that

14    stick against someone.  I understand what the Court's

15    saying, that if you're walking down the street and see

16    somebody with a stick, you may be apprehensive --

17              THE COURT:  In the middle of a violent protest or

18    riot or whatever you want to call it.

19              MR. ROLLINS:  And I completely understand the

20    Court's point in that in that, you know, everything that's

21    happening -- if I see anybody carrying a port arms stick

22    outside I probably wouldn't be, but if I see stuff being

23    thrown and all of that and someone carrying a port arms

24    stick, I may have a little bit more apprehension.

25              THE COURT:  With a gas mask on.
```

1            MR. ROLLINS:  With a gas mask on.  I may not walk

2     up to that individual.

3            But at the same time, that individual is not

4     coming after me as well, and I think that is the big

5     difference here on what this individual's doing in the

6     nature and circumstances of this case.

7            THE COURT:  Right.  So, Mr. Rollins, I sat through

8     the same trial that you did.  I agree with you.  I saw what

9     I saw, and you saw what you saw.

10           MR. ROLLINS:  But --

11           THE COURT:  And I've got to say, you did an

12     excellent job defending a difficult case.  And, you know, I

13     think the difficulty of the case and some of these issues

14     we're talking about was reflected in the care with which

15     this jury approached the deliberations and the thoughtful

16     questions that it asked and time that it took to reach a

17     verdict, and I am confident that, you know, it grappled with

18     some of these issues that we've been talking about.

19           MR. ROLLINS:  Yes, so --

20           THE COURT:  And I get -- which is to say, though,

21     as my questions to Ms. Aloi, I think, probably suggested, I

22     get the differing interpretations that can be taken from

23     what he actually did that day, which we all saw.

24           I think the elephant in the room here is the post-

25     arrest conduct, and a lot of that, you know, we dealt with

1    in connection with the revocation proceeding.  A lot of it

2    was indicated at trial, but I've seen even more in the

3    sentencing materials which did not come out at trial.

4            And address whatever you'd like.  I don't want to

5    cut you off.  But, you know, that is, to me, more of an

6    aggravating factor that you have to deal with.

7            MR. ROLLINS:  So with that said, I'm going to back

8    away a little bit from the nature and circumstances of the

9    offense and kind of go into the history and characteristics

10   of my client.

11           THE COURT:  Okay.

12           MR. ROLLINS:  And let me just -- I met

13   Mr. Robertson over a year ago just by a phone call.  And

14   there's no question that me and Mr. Robertson may not see

15   eye to eye on politics, but the one thing that Mr. Robertson

16   and I -- and I've gotten to know him over the year.  It's

17   been a long year.

18           What you see and what the government's trying to

19   present now with sort of trying to make him out to be this

20   fraud, that is not this man.  And I get that they're trying

21   to say, oh, some of the stuff -- he may have boasted about

22   his background.  He may have boasted about some of the

23   things that occurred in his life.  But you can't boast and

24   you can't walk through and say that some of these things did

25   not occur when he saved lives from a fire that occurred in

1     his town, and that's in one of our exhibits.

2            You can't boast about his other credentials of

3     being awarded certificates of recognition for courageous

4     actions and unselfish dedication.  That's also all in our

5     exhibits.

6            You can't boast -- these are absolute truths.

7     Someone has presented this to him.  Newspaper articles have

8     been written on him.  This is all to say, hey, this

9     gentleman in our community did these good things.  And I'm

10     referencing an article just in terms of where he was honored

11     for one of the high DUI arrest rates in his town.  I am

12     referencing that he put -- "Cops Offer Gun Locks For Kids."

13     That was also in his town.

14            So Ms. Aloi, she comes in here and basically tries

15     to destroy his character, and that's not this man, and

16     that's not who this man is.

17            Yes, he's made some clear mistakes in life, but if

18     you look at the totality of this human being and what he's

19     done with his life, the fact is he did serve his country.

20     The fact is that he did go overseas, and he was injured; and

21     when he was injured in that contract position, that was

22     still for this country.  He was training other officers over

23     in the foreign land.  So -- and then I go into the 2005

24     sexual assault allegation where investigation --

25            THE COURT:  So he embellished, but he didn't lie.

1    Is that fair to say?

2              MR. ROLLINS:  That is exactly what's happened

3    here.  And we had a joke about it.  Sometimes you may be

4    trying to tell a woman something to get her to like you, and

5    that may be where his embellishment went.  No question.

6              But like I said, you can't embellish the 2005

7    sexual assault investigation wherein he got a confession

8    from a child molester.  You can't embellish that.

9              You can't embellish some of the things that he's

10   just done in his life.  And I'm not going to go through all

11   of them because there are over 35 pages of letters of

12   commendation to Sergeant Thomas, recognition of Army

13   achievements.  These aren't over embellishments.

14             I'm going to get to the -- I want to move on from

15   his character because I think, you know, you can say what

16   you want, and Ms. Aloi can say what she wants about his

17   character, but I rest on the fact that this man has good

18   character.  This man has produced -- he's provided to his

19   community.  He's always served his fellow man, whether it

20   was in the Army or in the police force.  That's all he's

21   known his entire life.

22             And when Ms. Aloi speaks to or the government

23   speaks to the request to hold him essentially for 96

24   months -- and I'm just going to -- I'm going to bring this

25   out.

1          Mr. Fracker and Mr. Robertson did wrong on that

2     day.  No question.  They both went into that building.  The

3     difference between the two is that Mr. Robertson had the

4     walking stick.  They both had on masks.  They both were

5     police officers.  They both did -- they both were wrong

6     that day, but the government says that Mr. Fracker should

7     be awarded probation for six months, a probation term,

8     because -- and they list four reasons.

9          The choices and activities that he made on January

10    6th were not for personal gain but because of misguided,

11    false belief that the actions were altruistic and good for

12    the country.  That's exactly what Mr. Robertson thought as

13    well.

14         They then say, number two, it's because he was

15    influenced by his mentor, father.  That does not apply.

16         They then go into number three.  He immediately

17    turned himself in to authorities when he found out he had a

18    warrant.  Mr. Robertson also did that.

19         Number four, he has suffered great personal cost

20    to himself because essentially all Mr. Fracker's ever known

21    is a police officer and serving his country.

22         The two individuals are almost -- you know, I get

23    there's a huge age difference between the two, but the

24    disparities in sentencing between those two where someone

25    gets six months -- and I'm not saying -- Mr. Fracker, in his

1    statement to the Court, was essentially saying what I did is

2    on my own, and this is even on the stand when he was asked

3    about the conspiracy.  He basically said he did what he did.

4    And I don't think he was trying to throw Mr. Robertson under

5    the bus, but he agreed that his actions were his actions.

6          And I guess what I'm trying to get to is their

7    actions were almost similar in the entire context, and there

8    was no physical violence from either one of them.  And at

9    the end of the day, what we had after the fact is that his

10   age and some of his -- when he got home and some of the

11   stuff that was coming at him -- and you read his statement

12   to the Court, that he started drinking and probably did go

13   down this rabbit hole of this thought process just feeding

14   into what -- when all you watch and you pay attention to

15   that, that's all you hear, and that's all you know.  You

16   don't see the other side.  And he was being fed into that,

17   and he did go down that rabbit hole.

18          So the statements that he made that he just listed

19   here today, yes, they're all true.  And honestly, he admits

20   it was a complete mistake, wish he had never said it, wish

21   he had never made any of these comments that he made; and,

22   again, somewhat just boasting and angry and everything

23   that's occurring at him -- everything that's occurred.  But

24   that was -- that's just how he felt at the time and

25   drinking, and he was angry.

1          I take absolute issue with the government's

2     response that somehow this man was going to form an arsenal

3     and somehow hurt people.  He served this country.  And I

4     understand these times, but he served his country.  He's

5     bled for this country, and to say that he now would come in

6     and then form an arsenal to try to hurt people and try to

7     destroy them, I suggest that's not who this man is.

8          THE COURT:  All right.  But, look, you know, he

9     ordered 34 very dangerous weapons while he's under criminal

10    indictment under conditions.  I found that there was

11    probable cause to believe that that violated a federal

12    statute.  Combining that -- and this is, you know, six

13    months after his arrest, after he had had plenty of time to

14    reflect on the effects of his conduct, the consequences of

15    his conduct, combined with these statements that -- you

16    know, I'll get to them -- that advance more than just

17    standard partisan political discussion.

18          How can I have any confidence that he would not be

19    a danger to the community, if released?  You're asking for

20    essentially a probationary sentence any time soon.  And that

21    obviously is, you know, the -- maybe the primary

22    consideration that this Court has to take into account.

23          MR. ROLLINS:  Well, I mean, whether the government

24    ever charges him with those charges -- and I'm going to -- I

25    mean, to some mitigation, yes, the weapons were ordered.

1    They were delivered to a firearm dealer.  They weren't

2    delivered directly to him.  And he is having to say that he

3    didn't --

4            THE COURT:  And the weapons that he was forced to

5    give up, they're in a neighbor's basement, and he has access

6    to them.

7            MR. ROLLINS:  Right.  But he did give them up,

8    and, yes, at some point he still could go into the store,

9    the firearm dealership, as well and get access to it.

10           THE COURT:  And he did apparently.

11           MR. ROLLINS:  No, he never got -- he never went

12   into the firearm dealership to get access to those weapons.

13   He never touched them.  He didn't go in -- he didn't go at

14   them.

15           THE COURT:  I recall differently.  He didn't take

16   them, but he handled them.

17           MR. ROLLINS:  Okay.  Maybe.  I don't recall

18   completely, but I don't think that he ever took possession

19   of those weapons, and that's my recollection of that.

20           But to hold him accountable for that second -- for

21   what he did while he was on pretrial, I mean, I guess it's

22   like squeezing blood out of a turnip.  How much more do we

23   take from this man?  He has been away from his family for 13

24   months.  He was a police officer the day before all this

25   started, and we've taken everything from him.

1          Once he gets -- he will eventually be released.  I

2     mean, obviously.  This is not a life sentence, so obviously

3     he will be released.  His life is already in shambles, and I

4     just look at the government:  How much more do you want from

5     this man?

6          His life is in shambles.  He will never go back to

7     what he's done.  It's all he's ever known.  It's all he's

8     ever done.  And at this juncture I just think mercy and

9     leniency should be applied here, and I think that's why I

10    just cut across and disagree with the guideline scoring

11    here, and to give someone 96 months for essentially -- and

12    we can disagree on this -- but for essentially unlawful

13    entry, trespassing onto that property, to give him 96

14    months.

15         And given the fact of other sentences where people

16    have done some really vicious things, this man did not do

17    those things.  And the government's trying to lump him in

18    with people who have swung, thrown things, and hurt

19    officers, trying to lump him in with that same group of

20    people.

21         And I get why they may think that because of the

22    activity while he was on pretrial, but I don't think that

23    this -- I think this Court should absolutely offer a

24    variance, especially on the eight points.  I think that is

25    a -- to give him that full eight points on that I don't

1          think would be a fair and just position.

2                    THE COURT:  Okay.  Very well.

3                    MR. ROLLINS:  Thank you.

4                    THE COURT:  Mr. Robertson, anything you'd like to

5          tell the Court before I impose your sentence?

6                    THE DEFENDANT:  No, Your Honor.

7                    THE COURT:  Okay.  Why don't you approach with

8          Mr. Rollins.

9                    All right.  Mr. Robertson, I know we talk a lot

10         about these guideline figures and numbers and offense levels

11         and all that stuff, and I think sometimes defendants think

12         that this is a formulaic exercise, when it's not, okay?  I

13         realize I have flesh and blood in front of me with lots of

14         collateral consequences and various considerations that are

15         unique to every defendant, and I try my best to take that

16         into account.

17                   I am not the kind of judge that lectures

18         defendants, but I try to explain thoroughly why I've come

19         out the way that I have.  And there are a variety of

20         factors -- we've talked about them today -- that courts are

21         required to consider when sentencing a defendant in federal

22         court, and I will -- I may not touch on all of them, but

23         I'll do my best to touch on the ones that I think are most

24         important in this case.

25                   Our starting point has to be those sentencing

1    guidelines that we've talked so much about.  Your range is

2    87 to 108 months as the Court has calculated it, and that's

3    a long time, and it's a long time because that reflects the

4    seriousness of the offenses that you were convicted of.  But

5    as I said, it's significantly driven by that eight-level

6    enhancement that we've talked about.  Without that

7    enhancement, your range would be less than half of what it

8    is.

9           It's also high because of the fact that you chose

10   to go to trial, and you didn't get a reduction for

11   acceptance of responsibility had you pled guilty.  And that

12   is -- that's your choice, but that's the consequence of your

13   choice, and your range would have been about a full two

14   years lower had you made a different choice and maybe lower

15   than that because you were likely -- I don't know what the

16   plea offer was, but you may have been offered, you know, a

17   subset of the counts that you ultimately proceeded to trial

18   on.

19          The next factor is the offense.  It's what you

20   did.  I won't review all of the evidence.  We've sat through

21   it, but for weeks prior to January 6th after the election

22   you expressed your view that the election had been rigged.

23   You advocated for an armed rebellion and a counter

24   insurgency to overturn the result.  So when you invited

25   Mr. Fracker and others to come to D.C. on January 6th, it

1    was not just to listen to a speech or to protest.  I believe

2    that the jury was correct in finding that at least one of

3    your motivations was to interfere with what was going on in

4    Congress that day.

5         And when you got into your truck, you were at

6    least expecting some form of violence.  You brought a gas

7    mask; you brought a gun, which I think you had the good

8    sense to leave in your car, if I'm not mistaken; and you

9    brought that big old stick that we've talked so much about

10   that you had used before as a police officer, not for a

11   walking stick, but for crowd control.  You were one of the

12   first ones up the West Terrace stairs, which was one of the

13   most chaotic and violent scenes of that day, and we watched

14   those videos many times, and they're very jarring and

15   disturbing.

16        You are also one of the first -- you were among

17   the first wave of people in the Capitol.  Only three

18   minutes, about, after someone broke through the Senate Wing

19   doors at 2:13 p.m.  You stayed in for a number of minutes

20   and proceeded further into the Crypt of the Capitol.

21        All of this says that you were not some bystander

22   who just got swept up in the crowd and in the emotion, but

23   you were an active and willing participant, and that you

24   were there for the purpose of disrupting the count, which

25   Mr. Fracker testified to and which the jury found.

1    Now, as to that eight-level enhancement, we all

2    agree that there was no actual physical violence, no verbal

3    threats.  Your conduct, I have found, was threatening as

4    contemplated by that particular provision, but it was not

5    the most aggressive and violent thing that the Court has

6    ever seen, and I'll just leave it at that.

7    As I said before, that enhancement encompasses a

8    wide range of conduct from mere threats to extreme violence.

9    I think your conduct probably falls somewhere in maybe

10   towards the lower end of that continuum.  So if I were just

11   assessing your conduct at the Capitol, I would conclude that

12   that eight-level enhancement, which, again, more than

13   doubles your potential sentence, overstates your -- the

14   seriousness of your activity, and I would likely give you a

15   below guidelines sentence.

16   But there are other things to consider, the most

17   important of which is your acceptance of responsibility.

18   You obviously chose to go to trial, which is entirely your

19   right, so, as I said, you do not get credit for any

20   acceptance of responsibility from a guidelines perspective.

21   And despite your letter, which I'll get to in a minute, I

22   don't think that you have accepted responsibility.

23   Even after having time to reflect on the effect of

24   January 6th, you continued to advocate for violence in

25   response to the purportedly stolen election.  Your post on

1    January 8th, "The next revolution started 1/6, and in case

2    you" -- "I'm ready and standing by, if you guys missed it."

3    "In case you missed it, I'm ready and standing by."

4           In March you told one of your closest friends that

5    you were prepared to fight and die in a civil war.  "Civil

6    war is anything but civil.  I'll take the fight to their

7    homes and their fireside.  Never F with someone who is

8    prepared to do battle.  Call me an insurrectionist, and I

9    will oblige you."

10          In June, a full six months after January 6th, you

11   posted on a gun forum, "I have learned very well that if you

12   dip your toe into the rubicon, cross it.  Cross it hard and

13   violent and play for all the marbles."

14          And even more troubling coming from a former law

15   enforcement officer after four officers were killed on

16   January 6th and four more took their lives by their own hand

17   later, you advocated more violence against law enforcement.

18   You told Mr. Deacon, "I can kill every agent they send for

19   me for at least 2 weeks."

20          We've talked about whether that was hyperbole,

21   whether that was just boasting, whether that was just

22   something you were saying on Facebook, or Instagram, or

23   wherever it was, but it wasn't just your words.  It was also

24   your actions.  You destroyed evidence.  You continued to

25   possess weapons, including an M4 and an explosive device, in

1    repeated violations of your release conditions, and last

2    summer you ordered -- and we can call it an arsenal, we can

3    call it a cache, we can call it whatever we want -- numerous

4    automatic weapons while you were under federal indictment in

5    violation of not only this Court's orders but likely a

6    federal law.

7           And while you gave your neighbor your guns in

8    response to a court order, you maintained ready access to

9    them.  And except for the destruction of the cell phones,

10   none of that is incorporated in the guidelines analysis.

11          Now, I read your letter.  I appreciate your

12   letter.  You do say that you take full responsibility for

13   your actions, but frankly, as Mr. Rollins said, you have no

14   choice but to because it was all on video and in your own

15   words.  And I agree with the government that, you know, you

16   can call them excuses, you can call them justifications,

17   but, you know, it's not accepting responsibility when you

18   say that you were taking care of a buddy with cancer who was

19   a big Trump supporter and that's why you came.  Your wife

20   was away in New York.  You were drinking too much and

21   looking at social media too much.

22          Some of those things may explain or may go into

23   the mix of reasons why you came to D.C. that day, but they

24   don't explain why you continued to arm yourself and advocate

25   for violence, including against law enforcement well after

1    your arrest.  Nor does your letter say anything about the

2    victims of January 6th, including those law enforcement

3    officers, or the damage that January 6th did to our country

4    or our democratic institutions.

5          And I want to be clear.  I'm focusing on

6    acceptance of responsibility not just for its own sake, all

7    right?  It's not my job to make you remorseful.  It's not my

8    job to bring you to heel somehow.  You make your own

9    choices.  You think however you want to think, and that's

10   not my concern.  It's not about compliance, but it's about

11   deterrence; the need for me, which is my primary

12   responsibility, to protect the public.  And that's the most

13   striking and concerning part about this case from my

14   perspective, is your conduct after the arrest.

15          You know, I read this stuff, and it really seems

16   like you think of partisan politics as war, you know, and

17   that's just not the right way to think about it, and that

18   you continue to believe these conspiracy theories about the

19   election being stolen despite any evidence of that

20   whatsoever.  And I sincerely believe that you would likely

21   answer a call to duty if you were called to go do something

22   like this again, and that's the biggest consideration that

23   this Court has to consider.

24          Now, I also take into account your history.  You

25   have no prior criminal record despite having some challenges

1    as a kid that I won't go into on the record.  You have a

2    supportive family, you seem to have a good relationship with

3    your kids, and you have a network of friends.  Now, given

4    some of the texts, I'm not sure how healthy some of those

5    friendships are, but we've already discussed that.

6            Mr. Rollins has emphasized your professional

7    background quite a bit, and it's sort of a mixed bag.

8    You're an Army vet and a police officer.  Those are very

9    admirable professions.  I've read the various commendations

10   and the newspaper stories that you've submitted, and you can

11   be very proud of that service.

12           But as the government has pointed out, there's

13   also evidence that you have at least exaggerated your

14   military experience, and that you've used that to influence

15   Mr. Fracker, who apparently viewed you as something of a

16   mentor.  And as a member of law enforcement, you obviously

17   had an oath to uphold the law, and you violated that oath.

18           The last thing we have to consider -- the last

19   thing I'll mention is disparities, and Mr. Rollins noted it

20   with respect to Mr. Fracker.  I will get to him on Tuesday.

21   I've not read the government's materials or his materials,

22   and rest assured that I will make an independent

23   determination as to what an appropriate sentence is for him.

24           But I mentioned Mr. Reffitt's case, which was the

25   first January 6th case to go to trial.  Yours was the

1    second.  And I think they have some differences, but they

2    have many similarities.

3            As I said, both went to trial.  There was a

4    similar range of convictions.  Neither of you had any

5    criminal history.  You had the same exact offense level and

6    an 87-to-108-month guideline range, including the eight-

7    level enhancement that we've discussed.

8            Both of you had disturbing text messages before

9    January 6th advocating rebellion against the government

10   based on the election, although Mr. Reffitt's may have been

11   a little more specific.  You both carried but did not use a

12   dangerous weapon.  Mr. Reffitt had firearms, which is

13   obviously more concerning than your stick.  Neither of you

14   assaulted police officers.

15           In terms of the conduct underlying the eight-level

16   enhancement, Mr. Reffitt made clear and direct threats

17   against Speaker Pelosi and Minority Leader McConnell while

18   also attempting to obstruct the certification.  As we've

19   discussed, I'm not quite sure that your conduct rose to

20   that level.  On the other hand, you entered the Capitol, and

21   Mr. Reffitt did not.

22           You both engaged in destructive conduct.  He by

23   threatening his children and directing others to delete

24   their text messages; you by destroying your cell phones.

25           And on that point, the jury found that you

1    destroyed the cell phones, okay?  And as I said before, I

2    have confidence in that jury's verdict, and even still,

3    whether you did it or directed Mr. Fracker or somebody else,

4    you certainly knew about it as reflected in the text

5    messages that Ms. Aloi showed.

6         And the least favorable comparison between you and

7    Mr. Reffitt was that you continued to engage in dangerous

8    and illegal conduct while you were on release and

9    thereafter.  He also had some mental health issues that I'm

10   not sure are present here, and I'm not sure that that's a

11   distinguishing factor.

12        But on balance, I think the two cases are roughly

13   notionally the same, although it is impossible to compare

14   exactly each case.

15        Furthermore, while I have not compared the facts

16   closely, the three sentences or the three cases noted in the

17   government's memo, all of which involve convictions for

18   1512(c)(2) with the eight-level enhancement, seem comparable

19   when you consider that those were pleas rather than jury

20   convictions:  *U.S. v. Fairlamb*, where Judge Lamberth

21   sentenced the defendant to 41 months; *U.S. v. Duke Wilson*,

22   also Judge Lamberth, 51 months; and *U.S. v. Greg Rubenacker*,

23   Chief Judge Howell, 41 months.  So including all of the

24   factors that I have discussed today, the government -- the

25   Court concludes that a low end of the guidelines sentence is

1    the lowest one necessary to achieve all of the purposes of

2    sentencing.

3              So with that, pursuant to the Sentencing Reform

4    Act of 1984 and in consideration of the provisions of 18 USC

5    3553, as well as the advisory sentencing guidelines, it is

6    the judgment of the Court that you, Thomas Robertson, are

7    hereby sentenced to the custody of the Bureau of Prisons for

8    concurrent terms of 87 months on Counts 1, 3, 4, and 6, 60

9    months on Count 2, and six months on Count 5.  Again, those

10   counts will run concurrently, and you will be given credit

11   for time served since your arrest or the revocation of your

12   conditions.  You are further sentenced to serve a concurrent

13   term of 36 months of supervised release as to Counts 1, 2,

14   3, 4, and 6.

15             In addition, you are ordered to pay a special

16   assessment of $100 on each of Counts 1, 2, 3, 4, and 6 and

17   $10 on Count 5 for a total of $510 in accordance with 18 USC

18   3013.  The Court finds that you do not have the ability to

19   pay a fine and, therefore, waives imposition of a fine in

20   this case.

21             While on supervision, you shall abide by the

22   following mandatory conditions as well as the standard

23   conditions of supervision, which are imposed to establish

24   the basic expectations for your conduct while on

25   supervision.  The mandatory conditions include:

1          One, you must not commit another federal, state,

2     or local crime.

3          Two, you must not unlawfully possess a controlled

4     substance.

5          Three, you must refrain from any unlawful use of a

6     controlled substance.  You must submit to one drug test

7     within 15 days of placement on supervision and at least two

8     periodic drug tests thereafter as determined by the Court.

9          And, four, you must cooperate in the collection of

10    DNA as directed by your probation officer.

11         You shall also comply with the following special

12    conditions.

13         Ms. Baker, I am not going to impose a community

14    service condition.  Substance abuse testing, is that

15    necessary beyond the mandatory condition?

16         Mr. Robertson, you can have a seat now.

17         THE PROBATION OFFICER:  Your Honor, we had

18    asked --

19         THE COURT:  I didn't see a lot of evidence of

20    substance abuse in the presentence report.

21         THE PROBATION OFFICER:  And our reason or

22    justification for that was the alcohol consumption,

23    particularly after the events of January 6th.

24         THE COURT:  Okay.  I'm not going to impose a

25    substance abuse testing condition.  I will impose a mental

1    health treatment condition.

2         You must participate in a mental health treatment

3    program and follow the rules and regulations of that

4    program.  The probation officer, in consultation with the

5    treatment provider, will supervise your participation in the

6    program.

7         Mr. Robertson, I do this with some defendants, but

8    not all, which is to schedule a reentry hearing, so within

9    45 days of release from incarceration -- or why don't we

10   make that 60 days -- you shall appear before the Court for a

11   reentry progress hearing.

12        The United States Probation Office in the district

13   you are supervised will submit a progress report to the

14   Court within 30 days of the commencement of supervision.

15   Upon receipt of the progress report, the Court will

16   determine if your appearance is required.

17        This is just for me to meet with you to see how

18   things went and to make sure that you're on a good path.

19        The financial obligations are immediately payable

20   to the Clerk of the Court of the United States District

21   Court, 333 Constitution Avenue, Northwest, Washington, D.C.

22   Within 30 days of any change of address, you shall notify

23   the Clerk of the Court of the change until such time as the

24   financial obligation is paid in full.

25        The probation office shall release the presentence

1    investigation report to all appropriate agencies, which

2    includes the United States Probation Office in the approved

3    district of residence, in order to execute the sentence of

4    the Court.

5    Mr. Robertson resides in the Western District of

6    Virginia, Ms. Baker?

7    THE PROBATION OFFICER:  Yes, he does, and we will

8    ask the Court at the progress hearing to determine -- to

9    transfer jurisdiction at that time.

10    THE COURT:  Very well.  We'll defer the

11    jurisdiction.

12    Treatment agencies shall return the presentence

13    report to the probation office upon the defendant's

14    completion or termination from probation -- I'm sorry --

15    termination from treatment.

16    The matter of restitution, correct?  Are we going

17    to deal with that now, Ms. Aloi?

18    MS. ALOI:  Yes, Your Honor.  The government seeks

19    to $2,000 in restitution consistent with what's set forth in

20    our sentencing memo and the matter in which the other

21    defendants have been handled.

22    THE COURT:  Okay.  The Court finds that one of the

23    counts of conviction, 18 USC 1752(a)(1), triggers mandatory

24    restitution under the mandatory victims protection act, 18

25    USC Section 3663A.  The government has shown by a

1    preponderance of the evidence, namely letters submitted by

2    the Architect of the Capitol and other agencies responsible

3    for the Capitol, that the riots caused, Ms. Aloi, upwards of

4    $2.7 million; is that correct?

5              MS. ALOI:  At least, Your Honor.

6              THE COURT:  At least $2.7 million in damage.  The

7    Court finds that those agencies were the victims of the

8    riots as contemplated by the statute, and the Court further

9    finds that the government has adequately established that

10   $2,000 is a reasonable estimate of how much of the damage

11   should be apportioned on to the defendant, and that is

12   consistent with what other defendants have been ordered to

13   pay after trial as well as at least some plea arrangements.

14             Anything else on restitution, Ms. Aloi?

15             MS. ALOI:  Not from the government.

16             THE COURT:  Okay.  Mr. Robertson, you have the

17   right to appeal the verdict and sentence.  If you choose to

18   appeal, you must file any appeal within 14 days after the

19   Court enters judgment.  If you are unable to afford the cost

20   of an appeal, you may request permission from the Court to

21   file an appeal without cost to you.

22             As defined in 28 USC 2255, you also have the right

23   to challenge the conviction entered or the sentence imposed

24   if new and currently unavailable information becomes

25   available to you or on a claim that you received ineffective

1    assistance of counsel either in entering -- there was no

2    guilty plea, so ineffective assistance of counsel in

3    connection with trial or sentencing.  If you are unable to

4    afford the cost of an appeal, you may request permission

5    from the Court to file an appeal without cost to you.

6         Counsel, any other objections for the record?

7         MR. ROLLINS:  No, Your Honor.

8         THE COURT:  Okay.  Mr. Rollins, do you want to

9    make a placement recommendation?

10        MR. ROLLINS:  May I submit that in writing in 24

11   hours?

12        THE COURT:  Sure.

13        MR. ROLLINS:  Thank you.

14        THE COURT:  Ms. Baker, no issues with that, right?

15        THE PROBATION OFFICER:  No.

16        THE COURT:  Mr. Robertson, Mr. Rollins may make a

17   recommendation as to placement.  Generally it's proximity to

18   your residence.  The Court will make a recommendation, but

19   it's the Bureau of Prisons who will determine the final

20   placement.

21        Come up to the microphone.

22        So I read the letter from your wife, which I

23   thought was very thoughtful.  She has a criminology

24   background, I believe.  She talked about the lack of

25   services in the facility where you've been for the last year

1   or so.  I can appreciate that that has been frustrating.  I

2   think you -- hopefully you will find that whatever facility

3   you're placed with through the Bureau of Prisons will have

4   more outlets, will have more educational opportunities,

5   professional training opportunities.

6           I would encourage you to find something that you

7   can connect with that appeals to you that perhaps you can

8   even lead given your background and your experience and your

9   skills.  It will be very important for you to stay engaged

10  and to try to get the most out of this opportunity, as

11  unfortunate as it is, okay?  And when you come back, maybe

12  we can talk a little bit about your experience.  All right?

13          I often tell defendants that they should not be

14  judged by the worst mistake that they made, and that

15  certainly applies to you.  There's a lot to recommend you, a

16  lot that you should be proud of in your life and in your

17  background, and I would just encourage you to put this

18  behind you, to perhaps broaden your perspectives a little

19  bit, and your -- you know, what you rely on to get

20  information and to be a little more discerning about the

21  information that you do get.

22          You don't have to do that.  You don't have to take

23  my word, but it's just my two cents for whatever that's

24  worth.  All right?

25          Okay.  We're adjourned.  Good luck to you.

1          THE DEFENDANT:  Thank you.

2                 (Whereupon the hearing was

3                 concluded at 3:51 p.m.)

4

5          **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7          I, LISA A. MOREIRA, RDR, CRR, do hereby

8     certify that the above and foregoing constitutes a true and

9     accurate transcript of my stenographic notes and is a full,

10    true and complete transcript of the proceedings to the best

11    of my ability.

12       Dated this 1st day of September, 2022.

13

14
                              /s/Lisa A. Moreira, RDR, CRR
15                            Official Court Reporter
                              United States Courthouse
16                            Room 6718
                              333 Constitution Avenue, NW
17                            Washington, DC 20001

18

19

20

21

22

23

24

25